**HARVEY J. ROSS**, Plaintiff–Appellant, v. **STOUFFER HOTEL COMPANY (HAWAII) LTD., INC.**, dba **STOUFFER WAIOHAI RESORT; GLENN PERRY**, in his official capacity as General Manager of Stouffer Waiohai Resort; **CAROL FURTADO**, in her official capacity as Director of Personnel of Stouffer Waiohai Resort, Defendants–Appellees, and **JOHN DOES 1–10**; et al., Defendants

NO. 14932

(CIV. NO. 88–0072)

AUGUST 29, 1991

LUM, C.J., PADGETT, WAKATSUKI, AND MOON, JJ., AND INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, IN PLACE OF HAYASHI, J., RECUSED

OPINION OF THE COURT BY PADGETT, J.

This is an appeal from a summary judgment entered in the Fifth Circuit Court. We vacate the judgment and remand for further proceedings.

On May 27, 1986, Amfac Hotels adopted a policy which read in part:

> Effective May 1, 1986, the Waiohai/Poipu Beach Hotel's policy with regard to the hiring of relatives is revised as follows:
>
> . . . .
>
> 3. Two direct relatives* will not work in the same department together. If they marry after being employed here, one of the two will be asked to transfer or resign.
>
> . . . .
>
> *Direct relative defined as spouse. . . .

On August 1, 1986, appellant Harvey Ross was hired as a massage therapist. Viviana Treffry was employed as the principal massage therapist at the Waiohai Hotel. At the time of his hire, appellant and Treffry had been cohabiting for two years and they married eleven days after he was hired. According to the affidavit of Wade Lord, he, Lord, was the manager of the fitness spa, directly supervised appellant and his wife, knew that they had cohabited, and knew of their marriage even before it took place.

A little over a year later, on August 24, 1987, Stouffer Hotels acquired the hotel and, on October 16, 1987, made a decision to enforce the no–spouse rule against appellant.

The rule allowed either party to transfer out of the department but they declined to do so. Appellant was therefore terminated. Appellant brings this action claiming that his termination violated HRS § 378–2, which provides in pertinent part:

> It shall be an unlawful discriminatory practice:
>
> (1) For an employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment because of race, sex,

> age, religion, color, ancestry, physical handi-
> cap, marital status, or arrest and court record[.]

Appellant argues that he was terminated because of his marital status. Appellees argue that he was not terminated because of his marital status but because of whom he married.

There is some indication in the record that because appellant's wife was his superior, she had a duty under the pertinent statutes and regulations governing massage to report any infractions of the statutes and regulations by appellant, and that appellees were concerned with the inherent possibility of conflict in that situation. On the other hand, there is some indication in the record that appellant's wife offered to step down from her supervisory position in order to meet that concern.

We are here dealing with the specific sentence of paragraph 3 of the policy which reads, "[i]f they marry after being employed here, one of the two will be asked to transfer or resign." In our view, it is the fact of marriage which caused the termination. Apparently continued cohabitation without going through a marriage ceremony would not have been a violation of the policy.

Appellant and appellees have characterized the policy as a "no nepotism" rule. That however is a mischaracterization. Nepotism is defined in **BLACK'S LAW DICTIONARY** 1039 (6th ed. 1990) as:

> Bestowal of patronage by public officers in appointing
> others to positions by reason of blood or marital relation-
> ship to appointing authority.

In **WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY** 1518 (1986), nepotism is defined as:

> favoritism shown to nephews and other relatives (as by
> giving them positions because of their relationship rather
> than on their merits)[.]

The word itself derives from the Latin word "*nepos*," meaning grandson or nephew, and thus clearly deals with hiring someone

because of that person's relationship to the hirer. Nothing of that sort is involved in this policy.

Our statute, HRS § 378–2 is not unique. Many other states have similar, or identical, statutory provisions and litigation over the meaning of the term "marital status" as used in such statutes has resulted, with a marked split among the courts passing on whether a discriminatory policy such as that with which we are faced violates the statute.

New Jersey (*Thomson v. Sanborn's Motor Express, Inc.*, 154 N.J. Super. 555, 382 A.2d 53 (1977)), New York (*Manhattan Pizza Hut, Inc. v. New York State Human Rights Appeal Board*, 51 N.Y.2d 506, 415 N.E.2d 950 (1980), and Michigan (*Miller v. C.A. Muer Corp.*, 420 Mich. 355, 362 N.W.2d 650 (1984), and *Whirlpool Corp. v. Michigan Civil Rights Commission*, 425 Mich. 527, 390 N.W.2d 625 (1986)), have all adopted the view that such policies, as the one under which appellant was terminated, do not violate the prohibition against discrimination because of marital status. Basically their reasoning is that the termination was not because of the person's marital status but because of *whom* the person married.

On the other hand, Washington (*Washington Water Power Co. v. Washington State Human Rights Commission*, 91 Wash. 2d 62, 586 P.2d 1149 (1978)), Minnesota (*Kraft, Inc. v. State*, 284 N.W.2d 386 (Minn. 1979)), and Montana (*Thompson v. Board of Trustees*, 192 Mont. 266, 627 P.2d 1229 (1981)), have held that such policies violate the statutory provisions, reasoning that it is the marital status which causes the termination, or the refusal to hire, since by not entering into the marital relationship, or by obtaining a divorce, the disqualification would be removed, and the policy inapplicable.

In the Michigan case which dealt with a policy prohibiting marital relationships among employees, the Michigan court divided four to three. In the New York case, there was a dissent,

and, in the Montana case, there was also a dissent. Thus, it is clear from the opinions of courts of other states, as it is clear from the fact that there is a dissent to this opinion, that this is a question on which reasonable minds may differ.

The problem raised by the conflict between company policies prohibiting married persons from working for the same company, or in the same department, or in a supervisor/supervisee relationship, has also been the subject of scholarly comment. *See* Wexler, ***Husbands and Wives: An Uneasy Case for Antinepotism Rules***, 62 B.U.L. Rev. 75, 125–39 (1982); Note, ***Challenging No–Spouse Employment Policies as Marital Status Discrimination: A Balancing Approach***, 33 Wayne L. Rev. 1111 (1987). Those two studies, in substance, adopt the position of the Washington and Minnesota courts that a flat out prohibition against employees being married, such as is the case of the policy we are here dealing with, violates the prohibition against discrimination by reason of marital status. However, where an employer can show that the marital status of the employees has a relationship to the statutory exception for bona fide occupational qualifications, then a refusal to hire, or a termination, can be upheld.

The public policy argument behind encouraging marital relationships, enunciated in those opinions and comments seems to us persuasive as applied to the facts of this case. Appellant and his wife are licensed masseurs residing on the island of Kauai. Given the smallness of the community, obviously their opportunity to pursue their licensed occupation is limited. The employer's invocation of the policy a year after they had entered into a marital relationship left them with a Hobson's choice of one of them either giving up his or her employment, or their seeking a divorce, and continuing to live together and being employed in their chosen occupation. We hold the statute in question prohibits forcing a married couple to make such a choice, absent some statutory exception to the rule.

We conclude that as a matter of law, the policy in question of terminating persons who marry other persons working in the same department violates HRS § 378–2 unless the termination falls within one of the exceptions in HRS § 378–3. On the record in this case, we are not satisfied that the appellees have established that their policy falls within one of those exceptions, and accordingly, we vacate the judgment and remand the case for further proceedings consistent herewith.

Vacated and remanded.

*William Tagupa* (*Elizabeth J. Fujiwara* and *Ronald T. Fujiwara* co–counsel of record) for appellant.

*Perry Confalone* (*Robert S. Katz* with him on the brief; Torkildson, Katz, Jossem, Fonseca, Jaffe & Moore) for appellees.

## DISSENTING OPINION OF WAKATSUKI, J., WITH WHOM MOON, J., JOINS

I respectfully dissent.

Rather than focusing on interpreting Hawaii Revised Statutes (HRS) § 378–2, the majority, in my view, oversteps judicial bounds by legislating an important policy issue affecting business management--labor relations that should better be left to the legislature to decide.

HRS § 378–2(1) provides:

**Discriminatory practices made unlawful; offenses defined.** It shall be an unlawful discriminatory practice:

(1) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in terms, conditions, or privileges of employment because of race, sex, age, religion, color, ancestry, handicapped status, marital status, or arrest and court record[.]

"Marital status" is defined as "the state of being married or being single." HRS § 378–1.

This court's primary duty in interpreting a statute is to ascertain the intention of the legislature. *Villagonza v. Hawaiian Ins. Guar. Ass'n*, 70 Haw. 406, 408, 772 P.2d 1193, 1194–95 (1989). As a starting point, we look to the language of the statute itself. *Kam v. Noh*, 70 Haw. 321, 325, 770 P.2d 414, 416 (1989). Insofar as they comport with legislative intent, words of a statute should be read in their ordinary and popular sense. *Hawaiian Beaches, Inc. v. Kondo*, 52 Haw. 279, 281, 474 P.2d 538, 540 (1970).

[T]he plain and ordinary meaning of "marital status" is the social condition enjoyed by an individual by reason of his or her having participated or failed to participate in marriage. Illuminated another way, when one is queried about one's "marital status," the usual and complete answer would be expected to be a choice among "married," "single," etc., but would not be expected to include an identification of one's present or former spouse and certainly not the spouse's occupation.

*Manhattan Pizza Hut, Inc. v. New York State Human Rights Appeal Bd.*, 51 N.Y.2d 506, 511–12, 415 N.E.2d 950, 953 (1980).

It is also significant that the legislative history of HRS § 378–2 omits any mention of the issue before us. A prohibition of discrimination on the basis of identification of one's spouse covers

a wide array of personnel policies, including antinepotism policies, policies against hiring the spouse of a major business competitor, and policies against having spouses in supervisor–supervisee capacities. Such policies are widespread and backed by valid reasons. It is implausible "that the Legislature would have struck a blow at [such] policies with nary a word, in or out of the statute, to express or explain its intention[.]" *Manhattan Pizza Hut, Inc.*, 51 N.Y.2d at 513, 415 N.E.2d at 953.

Act 109, Session Laws of Hawaii 1975, which enacted the marital status discrimination prohibition was passed by both houses of the legislature without discussion. *See* 1975 House Journal, at 456, 491; 1975 Senate Journal, at 639, 709. Committee reports adopted by the House and Senate are terse and void of any mention of the issue before us. Hse. Stand. Comm. Rep. No. 576, *reprinted in* 1975 House Journal, at 1224–25; Sen. Stand. Comm. Rep. No. 1014, *reprinted in* 1975 Senate Journal, at 1217. The importance of this issue to business management and labor makes it unlikely that the prohibition which the majority reads into the statute could have been enacted unanimously[1] and without discussion.

The majority notes that the no–spouse policy as applied in this case is illogical because the policy would not have applied had Harvey Ross and Viviana Treffry merely cohabited (which they had done for two years) without getting married, even though the rationale underlying a no–spouse policy (to avoid favoritism or at the least a perception of favoritism) would be equally applicable to cohabiting couples. The majority further points to the fact that the employer chose not to enforce this policy until a year after the

---

[1] The bill passed in the House with 50 ayes and one excused, 1975 House Journal, at 491, and in the Senate with 24 ayes and one excused, 1975 Senate Journal, at 709.

Rosses were married, therefore, there is an indication that the no–spouse rule is not vital to the management of the employer's business. But these facts are immaterial and irrelevant to the issue before us. An employer is not precluded from adopting personnel policies which may be irrational and without logical business justification unless clearly prohibited by some statute or the constitution.

*Miller v. C.A. Muer Corp.*, 420 Mich. 355, 362 N.W.2d 650 (1984), involved two cases in which plaintiffs had married their co–workers, and pursuant to company policy, one spouse was required to transfer or be discharged. In interpreting a Michigan statute substantially similar to HRS § 378–2, the Michigan Supreme Court noted that the statute implemented civil rights laws in the employment arena. That court stated: "Civil rights acts seek to prevent discrimination against a person because of stereotyped impressions about the characteristics of a class to which the person belongs." *Id.* at 362, 362 N.W.2d at 653 (footnote omitted). The company policy preventing the spouses from working together did "not appear to reflect offensive or demeaning stereotypes, prejudices, or biases" which civil rights laws meant to prohibit. *Id.* at 364, 362 N.W.2d at 654.

The majority expresses concern that unless no–spouse policies are prohibited, employees will be discouraged from marrying. The policy of not discouraging marital relationships, while it may be in the public interest, is not a motivating factor behind civil rights laws such as HRS § 378–2.

Furthermore, as stated by the New York Court of Appeals:

> [The] fear that antinepotism rules will discourage marriage and encourage divorce, and thus undermine the freedom of persons to marry, seems, to say the least, far-fetched. Indeed, some with a practical bent might think that the pressures of employment supervision by one

spouse or other close relative over another, if anything, would add rather than detract from the normal tensions of an already close and somewhat consuming relationship. In any event, given the societal, religious, romantic and practical support arrayed behind the marriage institution, it is inconceivable that it would not withstand the fact that some employers believe close relatives are not the preferred choice for supervisors of one another.

*Manhattan Pizza Hut, Inc.*, 51 N.Y.2d at 513–14, 415 N.E.2d at 954.

It is clear that no–spouse policies do not reflect the type of discrimination civil rights acts are generally meant to remedy. And our legislature has remained silent in regard to prohibiting the type of personnel policy at issue here.

I would, therefore, hold that HRS § 378–2 does not prohibit the employer's action in this case. *Accord Whirlpool Corp. v. Michigan Civil Rights Comm'n*, 425 Mich. 527, 390 N.W.2d 625 (1986); *Miller v. C.A. Muer Corp., supra; Manhattan Pizza Hut, Inc. v. New York State Human Rights Appeal Bd., supra; Thomson v. Sanborn's Motor Express, Inc.*, 154 N.J. Super. 555, 382 A.2d 53 (1977).

I would affirm the judgment of the circuit court.