606 A.2d 273

**Harry SMITH et al.**

v.

**UNDERWRITERS AT LLOYD'S OF LONDON et al.**

**No. 92, Sept. Term, 1991.**

Court of Appeals of Maryland.

May 14, 1992.

James L. Rouse (Dori A. Wilson, both on brief), H. Thomas Howell (Donna L. Jacobs, Semmes, Bowen and Semmes, all on brief), Baltimore, for petitioners.

Kathleen A. Birrane (Lee H. Ogburn, Kramon and Graham, PA, all on brief), Baltimore, for respondents.

J. Joseph Curran, Jr., Atty. Gen., Meg L. Rosthal, Asst. Atty. Gen., Baltimore, for amicus curiae Ins. Com'r of State of Md.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

This case involves surplus line property insurance. In that context, " '[s]urplus line' insurance means the full amount or policy of insurance required to protect the interest of the insured which cannot be obtained ... from insurers authorized to do business in this State." Md.Code (1957, 1991 Repl.Vol.), Art. 48A, § 184(a).[1] Section 240A(a)(3) requires that an "insurer," giving notice of intention to cancel or not to renew a policy of property insurance "issued in this State," is obliged to see that the notice "is sent to the insured not less than 45 days prior to the date of the proposed cancellation or expiration of the policy, as the case may be." At issue here is whether the insurer on a surplus line policy covering property in Maryland is obliged to give the forty-five day notice required by § 240A(a)(3). As explained below, we shall hold that the surplus line carrier is not so obliged.

Appellant, Harry Smith (Smith), owns the premises 2509–13 Druid Hill Avenue in Baltimore City which he had

---

1. Unless otherwise specified all references to Art. 48A will be to Md.Code (1957, 1991 Repl.Vol.). References to a Code section will be to sections of Art. 48A.

acquired in 1974. Smith conducted an auto body shop business out of the improvements on those premises. Smith's insurance broker, Mayer & Steinberg, Inc. (M & S), had arranged for fire insurance through All Risks, Ltd. (All Risks), a Maryland licensed surplus line broker. All Risks, in turn, had placed that coverage with a syndicate, described in the policy as "certain Underwriters at LLOYD'S, LONDON," headed by John Michael Poland (Poland), a resident of England. The coverage was renewed annually. It is the policy for the period April 2, 1984, to April 2, 1985 (the Policy) with which we are concerned here.

All Risks caused the premises to be inspected in July 1984, resulting in requests that Smith make certain repairs. Absent receipt of any advice from Smith that the repairs had been made, All Risks, acting for Poland, mailed notice to Smith on November 14, 1984, that the Policy was cancelled effective November 24, 1984.[2] Smith's premises were heavily damaged by fire on February 10, 1985.

Smith brought this action in the Circuit Court for Baltimore City joining, *inter alia*, M & S and Poland.[3] The theory of Smith's case against Poland was that § 240A(a)(3) required Poland, acting through All Risks, to give forty-five days notice of cancellation, which had not been done.[4] The

---

2. In § IX of the Policy headed, "Other Provisions," in § 7 headed, "Mortgage Clause," there is a paragraph which reads as follows:
   "This Company reserves the right to cancel this policy at any time as provided by its terms, but in such case this policy shall continue in force for the benefit only of the mortgagee (or trustee) for 10 days after notice to the mortgagee (or trustee) of such cancellation and shall then cease, and this Company shall have the right, on like notice, to cancel this agreement."

3. Smith's complaint and amended complaint actually name the insurer as "Underwriters at Lloyd's of London." In this opinion we shall refer to the insurer as "Poland."

4. On January 11, 1989, the Court of Special Appeals held that a notice which does not in terms comply with the forty-five day notice requirement of § 240A does not effect cancellation of a policy after forty-five days have expired following the defective notice. *Admiral Ins. Co. v.*

circuit court granted Poland's motion for summary judgment on the ground that subtitle 15 of Art. 48A, containing § 240A, "is inapplicable to surplus carriers." The circuit court certified the judgment dismissing Poland from the case as a final judgment. Maryland Rule 2–602. Aggrieved by that judgment, Smith and M & S, which remains a defendant in the action, noted appeals to the Court of Special Appeals, where they filed separate briefs.

Thereafter, but before consideration of the matter by the intermediate appellate court, this Court granted Poland's petition for the writ of certiorari in order to consider this important question under the insurance laws. The Insurance Commissioner of Maryland has filed an *amicus curiae* brief with this Court in support of the position advocated by Poland.

The problem here is one of statutory construction. Before presenting the contentions of the parties, it will be helpful to define terms as they will be used hereafter. "The 'insurance business' includes the transaction of all matters pertaining to a contract of insurance, both prior to and subsequent to the effectuation of such a contract, and all matters arising out of such a contract or any claim thereunder." § 8(a). " 'Insurance' is a contract whereby one undertakes to indemnify another or pay or provide a specified or determinable amount or benefit upon determinable contingencies." § 2. An " '[i]nsurer' includes every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance." § 3. Poland is an insurer, engaged in the insurance business.

Under Art. 48A insurers are classified as to their place of legal origin. "A 'domestic' insurer is one formed under the laws of this State." § 6(1). "A 'foreign' insurer is one formed under the laws of any jurisdiction other than this State." § 6(2). "An 'alien' insurer is one formed under the laws of any country or jurisdiction other than the United

*John Stromberg & Assocs.*, 77 Md.App. 726, 551 A.2d 923, *cert. denied*, 315 Md. 691, 556 A.2d 673 (1989).

States of America, its states, districts, territories, and commonwealths." § 6(3). Insurers are also classified as "authorized" or "unauthorized." "An 'authorized' insurer is one duly authorized, by subsisting certificate of authority issued by the [State Insurance] Commissioner [of Maryland], to engage in the insurance business in this State," while "[a]n 'unauthorized' insurer is one not so authorized." § 7(1) and (2). Poland is an alien, unauthorized insurer.

In the major revision of the Insurance Code enacted by Chapter 553 of the Acts of 1963, the General Assembly for the first time added a "Surplus Lines" subtitle, subtitle 13, currently §§ 183 through 199, and an "Unauthorized Insurers" subtitle, subtitle 14, currently §§ 201 through 211A.[5] Surplus lines insurance, by definition, is that which cannot be obtained from authorized insurers, so that surplus lines insurers are always unauthorized insurers. § 184(a) and (b). If surplus line insurance is procured through a broker, that broker must be licensed as a surplus lines broker in Maryland. § 184(b)(1). The surplus lines broker must file an affidavit with the Commissioner demonstrating that the insurance is eligible as a surplus line. § 185. A surplus lines broker may not "place surplus line insurance with an unauthorized insurer which has not been approved by the Commissioner as a surplus line insurer," or "when that broker knows, or reasonably should have known, that the insurer was in an unsafe or insolvent financial condition." § 190(a) and (d). It is the surplus lines broker who "shall promptly deliver to the insured evidence of the insurance." § 191(a). The insurance contract or confirmation must state, conspicuously and in boldface on the first page, the following: " 'This insurance is issued by a nonadmitted insurer not under the jurisdiction of the Maryland Insur-

---

**5.** Subtitle 13 in general follows the recommendations of the final draft of the Proposed Non–Admitted Insurance Act promulgated by the National Association of Insurance Commissioners. *See* II *Proceedings of the National Association of Insurance Commissioners* 527–39 (1962). *See also* I *Proceedings of the National Association of Insurance Commissioners* 199–204 (1962).

ance Commissioner.' " § 186.[6] Section 193 imposes a recordkeeping obligation on the surplus lines broker who is to report premium receipts and pay the surplus line tax computed thereon. §§ 193 through 195. The Commissioner may revoke or suspend a surplus lines broker's certificate for various violations. § 196. Surplus lines insurers are expected to appoint the Commissioner as agent for accepting service of process in this State. § 197. The device for achieving compliance, similar to that utilized in § 190, is a prohibition against a surplus line broker's placing a risk with a surplus line insurer who has not so appointed the Commissioner. § 197.

Within the above-described scheme is § 187, on which Smith and M & S place heavy emphasis. That section reads:

"(a) Insurance contracts procured as surplus line coverages from unauthorized insurers in accordance with this subtitle shall be fully valid and enforceable as to all parties, and shall be given acceptance and recognition in all matters and respects to the same effect as like contracts issued by authorized insurers.

"(b) No insurance contract entered into in violation of this subtitle shall preclude the insured from enforcing his rights thereunder in accordance with the terms and provisions of said contract."

This section has never been amended by the General Assembly or construed by a Maryland appellate court in a reported opinion since its enactment in 1963.

Subtitle 14, "Unauthorized Insurers," as enacted in the 1963 revision, consisted of two parts, a prohibition against representing an unauthorized insurer and the former Unauthorized Insurers Process Act. The prohibition continues to date as § 201(a), reading in relevant part:

"No person shall in this State directly or indirectly act as agent for, or otherwise represent or aid on behalf of

---

6.  In this context the term "nonadmitted" means the same as "unauthorized," as defined in § 7.

another, any insurer not then authorized to transact insurance business in this State, in the solicitation, negotiation or effectuation of insurance ... inspection of risks, fixing of rates, investigation or adjustment of losses, collection of premiums, or in any other manner in the transaction of insurance business with respect to subjects of insurance resident, located or to be performed in this State.

"This section shall not apply to:

. . . .

"(2) Surplus lines insurance, and other transactions as to which certificate of authority is not required of an insurer as stated in § 43."

The prohibition in § 201 complements one found in Title 3, "Insurers: Authorization and General Requirements," where § 42 prohibits engaging "in the insurance business in this State except as authorized by a subsisting certificate of authority...." § 42(1). Section 43 provides certain exceptions from the prohibition of § 42, including "[t]ransactions pursuant to surplus lines coverages lawfully written pursuant to Subtitle 13 of this article." § 43(3).

The Unauthorized Insurers Process Act of the 1963 revision was repealed and reenacted by Chapter 487 of the Acts of 1968. Today the provisions of subtitle 14 that follow § 201, namely, §§ 202 through 211A, deal with substituted service on unauthorized insurers, through the Commissioner and through the Secretary of State, and those provisions deal with the collection of premium tax on policies that might have been written by unauthorized insurers. As a result of the 1968 amendment, an exclusion from the former Unauthorized Insurers Process Act for surplus lines insurers has been enlarged to the entire subtitle. Section 211A states that "[t]he provisions of this subtitle [14] shall not apply to ... [i]nsurance effectuated in accordance with the Surplus Line Insurance Law, Subtitle 13." § 211A(d).

In the 1963 revision of the Insurance Code the Unfair Trade Practices subtitle, subtitle 15, contained no provision requiring a minimum period of notice for cancellation or

non-renewal for any type of coverage. The provision at issue here, requiring a minimum period for notice of cancellation or non-renewal of property insurance was enacted by Chapter 436 of the Acts of 1971. It is an outgrowth of earlier provisions, also codified in subtitle 15 as § 240A, which regulated cancellation and non-renewal of motor vehicle policies. Currently § 240A(a) provides in relevant part as follows:

"(a)(1) Whenever an insurer gives notice of its intention to cancel or not to renew a policy of insurance other than life, health, motor vehicle liability insurance issued to any resident of a household in Maryland as set forth in § 240AA ... or before it cancels any such policy of insurance for a reason other than for nonpayment of premium, the insurer shall notify the insured of his possible right to replace such insurance through the Maryland property insurance availability plan, or any other plan, if there be such, and he may be eligible therefor.

"(2) ....

"(3) The insurer shall see that written notice of intention to cancel for a reason other than nonpayment of premium or notice of intention not to renew a policy issued in this State is sent to the insured not less than 45 days prior to the date of the proposed cancellation or expiration of the policy, as the case may be. Notice given the insured by an insurance broker or agent on behalf of the insurer shall be deemed to have been given by the insurer for the purposes of this subsection; provided, however, that no such notices shall be required where the agent or broker has replaced the insurance."

Smith and M & S, the appellants, argue that Poland is an insurer as defined in § 3, that his activity in issuing a policy to Smith and receiving premiums for insuring a risk in Maryland is the business of insurance as defined in § 8, and that no provision in subtitle 15, "Unfair Trade Practices," excepts or excludes from its imposition of requirements on insurers those insurers who write surplus lines business in Maryland. Pointing to the express exceptions for surplus

lines found in §§ 43, 201 and 211A, the appellants submit that the General Assembly makes specific exception for surplus lines business when that is the legislative intent. Appellants cite *Admiral Ins. Co. v. John Stromberg & Assocs.,* 77 Md.App. 726, 551 A.2d 923, *cert. denied,* 315 Md. 691, 556 A.2d 673 (1989), where the Court of Special Appeals applied § 240A to a policy of surplus line property insurance placed by All Risks with an unauthorized, foreign insurer.[7] Finally, appellants contend that, because § 240A undeniably applies to policies written on Maryland risks by authorized insurers, § 187(a) produces the same result for surplus lines insurers whose contracts "shall be given acceptance and recognition in all matters and respects to the same effect as like contracts issued by authorized insurers."

Poland's position is twofold. He first advances a geographical jurisdiction argument, submitting that the Policy was not issued in Maryland. Next, he argues that no part of subtitle 15 applies to surplus lines insurers because the totality of regulation intended by the General Assembly to apply to surplus lines business is found exclusively in subtitle 13. Both Poland and the Commissioner note the endorsement required by § 186 that advises the policyholder that the surplus line insurer is " 'not under the jurisdiction' " of the Commissioner. Both Poland and the Commissioner submit that, underlying the absence of regulation of surplus lines insurers, relative to that of authorized insurers, is the public policy of making available to Maryland residents coverages that would not otherwise be available. Poland and the Commissioner submit that, were requirements such as a forty-five day minimum notice period

---

7. Appellants also cite *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.,* 88 Md.App. 672, 698, 596 A.2d 687, 699–700 (1991), *cert. denied,* 326 Md. 435, 605 A.2d 137 (1992). There the Court of Special Appeals held that the anti-rebating provisions of § 226, a part of subtitle 15, apply to a surplus line carrier. Inasmuch as our decision here is limited to whether § 240A(a)(3) applies to surplus line carriers, we need express no opinion on *Evander.*

applied to surplus lines, the unauthorized carriers would not make their policies available to the substandard risk market, so that the object of subtitle 13 would be defeated.

■ We agree with portions of the arguments advanced by all of the parties. It is not necessary, however, in this case to make a holding as broad as the parties would have us make it. We do not accept Poland's geographical jurisdiction argument. By having All Risks cause the Policy issued by Poland to be delivered to Smith in Maryland on a Maryland risk for a premium ultimately to be paid to Poland by a Maryland resident, Poland's contacts with Maryland are sufficient to permit Maryland to legislate concerning the terms and provisions of the Policy. The true legal issue in this case is whether the General Assembly has done so in § 240A.[8]

The exception from the requirement for a certificate of authority, found in § 43(3), with respect to surplus lines "lawfully written pursuant to Subtitle 13," and the similar exception for "[i]nsurance effectuated in accordance with ... Subtitle 13," found in § 211A(e), from the requirements of subtitle 14, dealing with unauthorized insurers, do indicate that the rules relating to surplus line carriers will be found in subtitle 13. But that indication does not neces-

---

**8.** Other courts, deciding whether to apply a particular insurance code provision to a surplus line carrier, have focused on the particular code provision in question rather than on the whole. For cases holding that state guaranty funds are not liable for insolvent surplus line insurers *see Villagonza v. Hawaii Ins. Guar. Ass'n,* 70 Haw. 406, 772 P.2d 1193 (1989); *Railroad Roofing & Bldg. Supply Co. v. Financial Fire & Casualty Co.,* 85 N.J. 384, 427 A.2d 66 (1981); *Adams v. Illinois Ins. Guar. Fund,* 85 Ill.App.3d 867, 41 Ill.Dec. 140, 407 N.E.2d 638 (1980). For cases deciding whether to apply other types of provisions to surplus line carriers *see REM Constr., Inc. v. Houghton,* 162 Ariz. 322, 783 P.2d 261 (Ariz.Ct.App.1989) (regulations governing issuance of surety bonds); *Clarke v. Progressive American Ins. Co.,* 469 So.2d 319 (La.Ct.App.1985) (public policy provision that liability policies are for the benefit of all injured persons); *Barnes v. Underwriting Members of Lloyds,* 685 F.Supp. 144 (N.D.Tex.1987), *aff'd,* 866 F.2d 813 (5th Cir.1989) (provision invalidating certain insurance termination clauses).

sarily exclude regulation affecting surplus lines elsewhere in the Insurance Code, *e.g.*, among Unfair Trade Practices.

Similarly, the argument regarding the Commissioner's jurisdiction fails to appreciate the significance of private enforcement of statutorily created rights. The Commissioner's regulatory authority over insurers is ultimately enforced by the sanctions of revocation or suspension of the certificate of authority. § 55. Although the regulation of authorized insurers, particularly as to the sanctions of suspension or revocation, is not applicable to unauthorized insurers, it does not follow that the General Assembly forever renounced, by adopting subtitle 13, any statutory regulation of policies issued by surplus line carriers on Maryland risks, particularly if that statutory regulation can be privately enforced in an action of contract against the surplus line carrier in a court in this State.

On the other hand, *Admiral Ins. Co. v. John Stromberg & Assocs.*, relied on by appellants, did not address the argument that § 240A does not apply to surplus line carriers.[9] Appellants' other arguments attempt to prove too much. Section 187(a) does not make applicable to surplus line contracts all Insurance Code provisions applicable to like contracts issued by authorized insurers. Section 187 does not in terms state that result. Rather, its phraseology is more appropriate to affirming the validity of surplus lines contracts effectuated in accordance with subtitle 13. Under § 187(a), if such a contract is issued in accordance with subtitle 13, it is enforceable as to all parties "to the same effect as like contracts issued by authorized insurers." Under subsection 187(b), if a surplus line contract is issued in violation of subtitle 13, it is nevertheless enforceable by the insured in accordance with the contract's terms. Finally, the absence of any express exclusion of surplus lines carriers from all of subtitle 15, or from the operation of

---

**9.** *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 88 Md.App. 672, 596 A.2d 687, referred to in n. 7, did not deal with § 240A.

§ 240A, does not compel the result that surplus lines carriers are thereby included.

The narrow issue in this case is whether § 240A(a)(3), the forty-five day notice of cancellation provision for certain types of insurance, applies to surplus line carriers. In concluding that § 240A(a)(3) does not so apply, we construe that provision (1) in light of the history of the development of the notice requirement, (2) in comparison with other provisions of § 240A dealing with the class of insurers contemplated by that section, and (3) in accordance with the legislative policy toward substandard property insurance risks enunciated in subtitle 27A, the Maryland Property Insurance Availability Act.

(1)

Provisions codified as § 240A were first added to the Insurance Code by Chapter 778 of the Acts of 1965, effective June 1, 1965. That notice requirement related *only* to motor vehicle liability insurance, specifying the notice content, but not the notice period, for policy cancellation. The insurer was obliged to advise of the insured's possible right to obtain insurance through the Maryland Automobile Assigned Risk Plan.

Under § 198 of subtitle 13, the Commissioner may adopt regulations. In the regulation dealing with surplus lines, the list of "exportable items," that is, coverages eligible for placement of insurance with surplus line carriers, as revised November 1, 1965, did not include motor vehicle liability insurance. *See* Regulation 198–1 of the Insurance Department of Maryland, effective March 1, 1968, but including form 600 exportable items, as revised November 1, 1965.[10] Inasmuch as motor vehicle liability coverage was not an

---

10. The original surplus lines regulation, FDS No. 47, was effective December 31, 1963. The official copy of that regulation on file with the Clerk of this Court pursuant to the then Maryland Administrative Procedure Act does not have annexed thereto the "List of Coverages Eligible For Export on Form 600," although the regulation on file recites that annexation.

exportable item when § 240A was first enacted, it seems unlikely that the General Assembly intended "insurer," as used in original § 240A, to embrace an unauthorized insurer or surplus line carrier.

The requirement that the insurer giving the notice required by § 240A advise concerning the Maryland Automobile Assigned Risk Plan is also significant. Under that plan "[e]very insurer undertaking to transact in this State the business of" motor vehicle liability insurance was required, under penalty of possible license suspension, to participate in a plan "for the equitable apportionment among insurers of applicants for insurance who are in good faith entitled to, but who are unable to procure through ordinary methods, such insurance." Md.Code (1957, 1964 Repl.Vol.), § 243(n)(2) and (o). Thus, even if some unusual motor vehicle liability coverages were exportable in 1965, when § 240A was first enacted, it seems unlikely that the "insurer" referred to therein included a surplus line carrier for those hypothetical motor vehicle liability coverages. The Assigned Risk Plan had been created by Chapter 511 of the Acts of 1949 to handle the problem of substandard automobile risks. The requirement in original § 240A that the notice of cancellation or non-renewal advise concerning the Assigned Risk Plan contemplates policyholders who are no longer considered standard risks and who are being moved into the substandard market. Seemingly the General Assembly did not intend the "insurer" to include a hypothetical surplus lines motor vehicle liability carrier whose policyholders already presented substandard, or unusual, risks.

A requirement that the notice be thirty days prior to the proposed cancellation or expiration of the policy of motor vehicle liability insurance was added to § 240A by Chapter 218 of the Acts of 1966.

In 1971 the General Assembly broadened the scope of § 240A, making it applicable to "a policy of insurance other than life or health insurance" and specifying that the notice advise the insured of a possible right to replace property insurance through the Maryland Property Insurance Avail-

ability Plan. Acts of 1971, ch. 436. Those provisions are present § 240A(a)(1). The 1971 enactment also enlarged the period of notice to the present forty-five days found in § 240A(a)(3).

The Maryland Property Insurance Availability Act had been enacted by Chapter 172 of the Acts of 1969 and codified as subtitle 27A of the Insurance Code, Md.Code (1957, 1968 Repl.Vol., 1969 Cum.Supp.), §§ 478A through 478I. Subtitle 27A is the statutory basis for the Maryland FAIR Plan, one of the "Statewide Plans to Assure Fair Access to Insurance Requirements," under the Housing and Urban Development Act of 1968 (Pub.L. 90–448, approved Aug. 1, 1968) which, as amended, is codified in 12 U.S.C. § 1749bbb *et seq.* The Maryland FAIR Plan established an unincorporated association, known as the Joint Insurance Association (JIA)

"consisting of all insurers licensed to write in this State, on a direct basis, essential property insurance or any component thereof in multi-peril policies. Every such insurer shall be a member of the Association and shall remain a member as a condition of its authority to transact such kinds of insurance in this State."

§ 478C(1). The currently recited legislative purposes of the Maryland FAIR Plan include establishing "a program which would make essential property insurance and certain homeowner's insurance available from the [JIA] to all qualified applicants," § 478A(2), and "[t]o utilize fully the voluntary insurance market as a source of essential property and homeowner's insurance." § 478A(6). In operation, a FAIR Plan insures the property risks that, for whatever reason, are declined by the voluntary market. *See* D. Badain, *Insurance Redlining and the Future of the Urban Core*, 16 Colum.J.L. & Soc.Probs. 1, 1–19 (1980).

The 1971 amendments to § 240A, by requiring advice concerning the Maryland FAIR Plan in the notice of cancellation or non-renewal of property insurance, may be analyzed similarly to the required advice concerning the Assigned Risk Plan for motor vehicle liability coverage. Sec-

tion 240A(a)(1) addresses the problem of the property owner whose premises may no longer be insurable in the voluntary market and who may have to seek coverage from the JIA. Once again, this indicates that the General Assembly did not contemplate that the § 240A "insurer" included surplus lines carriers whose Maryland insureds already owned risks treated by the industry as substandard, or unusual.

### (2)

Present subsection (b) was added to § 240A by Chapter 455 of the Acts of 1987. Section 240A(b)(1) provides:

> "Except in the case of life insurance, health insurance, and annuities, when an insurer intends to cancel or not renew a line of business, the insurer shall file a plan of withdrawal with the Commissioner at least 60 days before the date of proposed withdrawal." [11]

The plan must state what necessitated the withdrawal. § 240A(b)(2). If that reason involves substantial changes in reinsurance, efforts to obtain replacement reinsurance must be described. § 240A(b)(3). "[T]he plan of withdrawal shall also contain a statement [i]dentifying the category of risk, the total number of risks written by the insurer in that line of business, and the number of risks intended to be cancelled or not renewed." § 240A(b)(4). The Commissioner is to review the plan to determine compliance with statutes prohibiting unfair and discriminatory underwriting. § 240A(b)(5).

The term "insurer" appearing in subsection (b) is not specially defined. Ordinarily, one would read "insurer" in (b) in the same way in which one would read the same term as used in (a). From the context of (b), surplus lines insurers are not contemplated. Surplus lines business is written on a risk-by-risk basis. The surplus lines broker, at the time of placing surplus line insurance, must make an

---

11. Effective July 1, 1991, § 240A(b)(1) was amended to increase to 180 days the time before which a plan must be filed. Acts of 1991, Ch. 377.

affidavit, as required by § 185, describing the "diligent search and effort ... made among the insurers who are authorized to transact and who are actually writing the particular kind and class of insurance in this State" and reflecting that "the amount of insurance eligible for an unauthorized insurer is only the excess over the amount procurable from authorized insurers." *See* § 184(b)(2).

A surplus lines insurer would not have occasion to withdraw an entire line from the Maryland voluntary market, because surplus lines insurers do not make entire lines generally available in the Maryland voluntary market.

### (3)

A relatively clear expression of Maryland public policy concerning the minimum period for notice of cancellation of property insurance, in relation to the substandard market, is found in the Maryland FAIR Plan. Substantial amendments were made to subtitle 27A by Chapter 574 of the Acts of 1980. These amendments enlarged public representation in the governing body of the JIA and required that homeowner's policies be written. The 1980 amendments also added present § 478C(7), legislatively mandating certain provisions which the program of operation of the FAIR Plan must contain. Section 478C(7) reads:

> "The program of operation shall provide for: (i) immediate binding of eligible risks; (ii) notwithstanding any provisions of §§ 240A through 240D of this article to the contrary, underwriting guidelines and procedures to be utilized by the Association which permit the Association to shorten the cancellation period of policies of essential property insurance and homeowner's insurance for certain conditions that are determined to exist; (iii) a premium installment plan; and (iv) the establishment of adequate service facilities."

Once a property risk is no longer insurable in the voluntary or standard market, the property owner must seek coverage either in the FAIR Plan or with surplus lines carriers. Insurance brokers might treat these potential

sources of coverage as relatively interchangeable, either generally or as to a given risk, or brokers might consider the JIA to be secondary and the surplus lines market to be tertiary. The result in this case is the same, whatever the facts of the marketplace might be. Section 478C(7)(ii) declares that the minimum notice period for property insurance cancellation under § 240A(a)(3) gives way in order to make coverage available through the JIA. If that secondary market is equivalent to surplus lines coverage, there would be no public policy reason for reading "insurer" in § 240A(a)(3) to include surplus lines insurers, and thereby to treat them differently from the JIA. If surplus lines insurers are a tertiary resort, to be approached if coverage through the JIA is not available, then there would be even less reason, from a public policy standpoint, to apply the forty-five day requirement of § 240A(a)(3) to unauthorized insurers of last resort.

Accordingly, summary judgment was properly granted in favor of Poland.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE DIVIDED BETWEEN HARRY SMITH AND MAYER & STEINBERG, INC., APPELLANTS.